## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| PAMELA STARK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  08-3219 |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

<u>OPINION</u>

JEANNE E. SCOTT, U.S. District Judge:

Plaintiff Pamela Stark appeals from a final decision of the Social Security Administration (SSA) denying her application for Supplemental Security Income (SSI) and Disability Insurance Benefits (DIB) under the Social Security Act.  <u>See</u> 42 U.S.C. §§ 423(d) & 1382c (SSI); 42 U.S.C. §§ 416(I) & 423 (DIB).  Stark brings this appeal pursuant to 42 U.S.C. § 405(g).  The parties have filed cross-motions for summary judgment or affirmance pursuant to Local Rule 8.1(D).  <u>Plaintiff's Motion for Summary Judgment (d/e 11)</u>; <u>Defendant's Motion for Summary Affirmance (d/e 13)</u>.  For the reasons set forth below, Stark's Motion for Summary Judgment is

denied, and the Defendant's Motion for Summary Affirmance is allowed. The Decision of the SSA is affirmed.

STATEMENT OF FACTS

I.      MEDICAL HISTORY

Stark was born August 18, 1957. Administrative Record (d/e 9) (A.R.) at 302. She finished ninth grade and part of tenth grade. She has past relevant work as a janitor/building cleaner and assistant executive housekeeper at a hotel.

In December 2002, Stark was struck in the head by a horse's head. On December 18, 2002, she sought medical treatment for the injury. A cervical computerized tomography (CT) scan and a magnetic resonance imaging (MRI) scan showed chronic degenerative disc disease with herniation, but no evidence of fracture, post-traumatic subluxation, or gross cord compression. A.R at 190-91.

On December 27, 2004, Stark was examined by Dr. David Gelber. A.R. at 188-89. Stark complained of neck and upper extremity pain. Specifically, Stark explained that at the time she was hit in the face by the horse, she developed neck pain which radiated down her arms, worse on the right side. Stark reported that her condition had recently worsened with

increased burning pain and some numbness in her arms. Stark stated that the pain interfered with her ability to use her arms in her part-time work as a building cleaner.

Dr. Gelber reviewed the MRI from 2002 and noted that it showed disc herniation, most prominent on the right side. Dr. Gelber also noted that Stark did not have medical insurance and had been unable to pursue intervention. Dr. Gelber described Stark as pleasant and cooperative, noting that she "appeared in no acute distress." A.R. at 188. Dr. Gelber's examination revealed mild tenderness in the cervical paraspinous muscles, but full range of motion in Stark's neck. Dr. Gelber suspected cervical radiculopathy, but noted no focal weakness. Dr. Gelber determined that conservative management approaches were appropriate, noting cost concerns. He prescribed amitriptyline for pain at bedtime.

On May 18, 2005, Dr. Vittal Chapa examined Stark in connection with her application for SSI and DIB. A.R. at 192-95. Dr. Chapa did not have Stark's medical records. Stark informed Dr. Chapa that she was hit in the head by a horse in December 2002 and "[h]er neck popped." A.R. at 192. Stark reported that she had been told she had herniated discs in her neck and that her arms went numb, her legs and back hurt, her neck was

stiff, she could not wash her hair, and she had trouble sleeping well at night. Dr. Chapa noted that Stark could bear weight and ambulate without any ambulatory needs. Dr. Chapa saw no edema in Stark's lower extremities. He noted that cranial nerves II through XII were within normal limits and there was no specific motor weakness or muscle atrophy. Dr. Chapa observed that Stark had "a good hand grip bilaterally" and could "perform both fine and gross manipulations with both hands." A.R. at 194. Dr. Chapa also noted no major restriction of motion in Stark's shoulders or cervical spine. Dr. Chapa found that Stark's upper extremity reflexes were symmetric. Dr. Chapa characterized Stark as cooperative.

On May 23, 2005, Dr. Frank Jimenez reviewed the medical records and concluded that Stark's impairment was non-severe. A.R. at 207-08. Dr. Jimenez expressly noted that Dr. Chapa's examination revealed no range of motion loss or neurological deficit.

On July 18, 2005, Stark was evaluated by Dr. Stephen Pineda. A.R. at 199-201. Dr. Pineda ordered a new MRI scan, which revealed some central and right side stenosis. Dr. Pineda saw Stark for follow-up on July 26, 2005. A.R. at 197-98. He noted that Stark complained of neck pain, but that the pain was not going down her arms and she did not complain of

other numbness or weakness in her upper extremities. Dr. Pineda noted Stark's complaint that she occasionally experienced numbness in her legs. Dr. Pineda diagnosed cervical disc disease and ordered a cervical epidural. According to information submitted by Stark, Dr. Pineda refused to give Stark a written excuse not to work, informing her that he was not a disability doctor. A.R. at 117, 308-09.

On August 26, 2005, Dr. Victoria Dow reviewed the medical records and concluded that Stark's impairment was non-severe. A.R. at 205-06. Dr. Dow recognized that Stark exhibited stenosis, but noted no neurological deficits and no weakness.

On February 24, 2006, Stark was examined by Dr. Dinraj Hegde at the Capitol Community Health Center. A.R. at 232-35. Stark reported that she had been experiencing neck pain since being hit by the horse in 2002. She complained of "Numbness, Pain radiating to arms." A.R. at 233. Dr. Hegde noted neck tenderness.

Stark returned to Dr. Hegde on March 31, 2006, complaining of a twisted ankle and chronic neck pain. A.R. at 230-31. Dr. Hegde's notes indicate that Stark was taking only over-the-counter Tylenol for her neck pain. Dr. Hegde prescribed Darvocet for Stark's ankle pain and noted that

he would reassess her neck pain in two weeks.

On April 18, 2006, Dr. Hegde examined Stark again. A.R. at 228-29. Dr. Hegde's notes characterize the reason for Stark's visit as follows: "Talk about disability – needs letter stating she can not work." A.R. at 228. Stark was taking Darvocet at the time of the visit. Stark complained of ankle pain and neck pain. Dr. Hegde told Stark that physical therapy would work for her ankle sprain. With respect to neck pain, Dr. Hegde noted "wants letter that she can't work." A.R. at 229. Dr. Hegde ordered follow-up in three months.

In a letter, dated April 19, 2006, Dr. Hegde wrote as follows:

To whom it Concerns,

Ms. Stark is a forty-eight year old female complaining of neck pain since 2002. Her pain is radiating to her arms. Patient is not able to work due to this reason.

Any questions please call the office.

A.R. at 227.

Stark returned to Dr. Hegde on May 31, 2006. A.R. at 223-24. Dr. Hegde's notes characterize the reason for Stark's visit as follows: "Paperwork and needs darvocet." A.R. at 223. Dr. Hegde noted that Stark had attended physical therapy one time and her ankle pain was resolving. With

respect to neck pain, Dr. Hegde noted "Pt wants to apply for disability. Got papers." A.R. at 224. Dr. Hegde prescribed Darvocet and directed follow-up in two months. A.R. at 224-25. He also referred Stark to physical therapy for a functional assessment, noting that Stark complained of neck pain, arm pain, back pain, inability to sit longer than one hour at a time, and inability to lift a jug of milk. A.R. at 226. Dr. Hegde noted that Stark "needs assessed for Disability." Id.

Also on May 31, 2006, Dr. Hegde completed an SSA Listing of Impairments form and a Levels of Work form for Stark. A.R. at 210-12. Dr. Hegde indicated the Stark's impairment was the medical equivalent of Listing § 1.02 – Major dysfunction of a joint(s) (due to any cause). A.R. at 210-11. Dr. Hegde opined that Stark could perform less than sedentary sustained work. A.R. at 212.

On July 19, 2006, Stark had a follow-up appointment with Dr. Hegde. A.R. at 221-22. Dr. Hegde's notes indicate that the functional assessment was performed that day and a report would be finished the next week. Dr. Hegde directed follow-up in two months.

Physical therapist Ann Crain conducted Stark's functional assessment on July 19, 2006. A.R. at 214-16. Crain noted that Stark exhibited active

range of motion within functional limits with respect to both her lumbar and cervical spine. A.R. at 215. Crain noted deficiencies in strength testing relating to both Stark's upper and lower extremities, although Crain also noted "very minimal effort provided during resisted testing" in the lower extremities. Id. With respect to strength testing of the upper extremities, Crain noted that "it took a significant amount of cueing to get [Stark] to produce any type of effort with testing." Id. Crain applied a series of lifting tests, which Stark successfully performed, including lifting and carrying a seventeen-pound box and a five-pound satchel; grasping and carrying a gallon jug for ten feet on two separate occasions; and carrying an eight-ounce glass of water for sixty feet with both her right and left hand without spilling it. A.R. at 215-16.

Stark returned to the Capitol Community Health Center in February 2007 for a pap smear and mammogram. A.R. at 242-47. In April 2007, Stark saw Dr. Hegde for follow-up on her neck pain, reporting pain on extension. A.R. at 240-41. Dr. Hegde noted that Stark could not afford physical therapy and again prescribed Darvocet. He ordered follow-up in two months.

On July 17, 2007, Dr. Hegde again saw Stark for follow-up. A.R. at

238-39.  Stark again reported neck pain on extension.  Dr. Hegde again prescribed Darvocet and directed follow-up in six months.  Stark followed up with Dr. Hegde on January 7, 2008.  A.R. at 248-49.  Stark complained of leg pain, lower back pain since childhood that worsened at night, and neck pain since 2002.  Dr. Hegde's notes reflect that the reason for the visit, which occurred the day before the administrative hearing before the SSA, was "[recheck] on neck, also needs statement for legs [&] arm."  A.R. at 248.  Dr. Hegde's examination revealed neck tenderness and pain on exertion.  He again noted that Stark could not afford physical therapy.  Dr. Hegde ordered an MRI relating to the leg pain, noting that its etiology was not clear.  The MRI, which was conducted on January 11, 2008, revealed mild diffuse disc bulging in several areas with some focal protusion but only minimal narrowing of the spinal canal.  A.R. at 252.

II.    <u>ADMINISTRATIVE HEARING</u>

Stark applied for SSI and DIB on March 25, 2005, alleging disability beginning December 15, 2002.  Stark's claim was denied initially and on reconsideration.  Stark requested an administrative hearing, which was held January 8, 2008.  The Administrative Law Judge (ALJ) heard testimony from Stark and vocational expert Thomas Dunleavy.

Stark testified that she was married with two adult children. She stated that she lived in a house with her husband. Stark had a driver's license, but her husband drove her to the hearing. Stark stated that she last worked in June 2005 as a part-time janitor, a position she held on and off for approximately ten years. According to Stark, she quit the janitorial position because her arms and legs started bothering her a lot and "[i]t just got to be too much." A.R. at 305. Stark testified that until September 2002 she also worked full-time as a housekeeper at a hotel. Stark was terminated from her position at the hotel for refusing to clean up vomit. During the periods of time that Stark worked both the full-time and part-time jobs, she would work an average of sixty hours per week.

Stark testified that she was currently taking Darvocet and Tylenol for pain. Stark stated that she experienced pains in her lower back that began when she was younger. Stark also stated that she began experiencing problems with her neck on December 15, 2002, after being hit by a horse. Stark explained that she was riding a mule at the fair grounds, when the mule did a u-turn. A boy riding the horse behind her failed to take his horse backward and his horse's head smacked Stark right in the face. Stark sought medical treatment at the hospital three days later. Stark testified

that she kept working after the horse incident.

When asked to describe the problem with her neck, Stark testified that she experienced burning between her shoulders and could not bend her head back all the way or turn it completely to the left or right. She stated that her "arms shake a lot" and her "legs hurt all the time." A.R. at 313. Stark described these symptoms as "constant." A.R. at 314. When asked how her symptoms affected her daily activity, Stark testified as follows: "I don't really do anything. I sleep a lot. My husband does a lot of the work around there. I maybe pop a hot dish of water in the microwave and make some oatmeal or something like that." A.R. at 314. Stark stated that she would sleep about six or seven hours during the day. She explained that at night she would take a Darvocet, which would knock her out for about half an hour, but she would be up twenty minutes later because her leg hurt. Stark estimated that she slept about eleven hours in a twenty-four hour day.

Stark denied doing any household activities. She testified that when she was not sleeping she was "[j]ust sitting," but that she could only sit at the computer for fifteen minutes. A.R. at 315. Stark stated that she had to get up and walk around every twenty minutes or half hour. Stark testified that she would break dishes because her hands would shake a lot, that she

experienced pain in her left shoulder when lifting a gallon of milk, and that she sometimes had trouble holding onto a fork or knife. Stark also stated that her husband would have to help her wash her hair at times because her arms would get tired when she held them above her head. A.R. at 324. She explained that she also had trouble shaving her legs because her legs would shake and she would cut herself. She testified that her husband would also have to help her with her bra because she had trouble reaching behind her back. Stark also stated that her handwriting was sloppier now because of the shaking in her arms.

Stark testified that she drove alone about once every other week and that it sometimes caused pain to push on the accelerator and the brake pedal. Stark stated that the longest time that she could drive would be half an hour and that she would feel a little tired after doing so. A.R. at 329.

Stark also testified that she would walk outside alone whenever it was nice outside. Stark stated that, during her walks, she would become out of breath by the time she got to the corner of her block. Stark later testified that her legs would also hurt during her walks. Stark's husband was away from the house during the day, leaving her alone until about 4:00 p.m. Stark testified that she rarely ate lunch, but that she would eat out at a

restaurant about four or five times a week. She stated that she watched about two hours of television a day and could read for about fifteen or twenty minutes. Stark testified that she gave up bowling in 2002 and had no recreational hobbies. She stated that she would go to Walmart twice a month with her husband and that her last vacation was fifteen years prior. According to Stark, she did not cook because she was afraid she would drop something and burn herself, and she could not carry in groceries after a trip to the store.

Stark testified that she would see her mom once or twice a week and her son three or four times a month. According to Stark, she did not have anyone come into her home to help her, but her son would come to help when she needed him.

Stark testified that, "[e]very once in a while,"she would "get a real sharp pain on the left side of [her] head" which would last about ten minutes. A.R. at 326. Stark stated that she would take Tylenol for this pain. Stark also testified that she experienced numbness or tingling in her lower back and sometimes in her arms.

Stark testified that she had one epidural which did not provide any relief and that she has not been to see more doctors because she does not

have health insurance or any money. According to Stark, the shaking in her arms and legs gets worse at times, although she does not know what makes it worse. Stark testified that, even with a sit/stand option, she would not be able to work for eight hours because her legs hurt too much. A.R. at 328. She stated that she could not sit or stand that long and would have to take a nap or lie down.

Vocational expert Thomas Dunleavy also testified. Dunleavy testified that Stark's prior work as an assistant executive housekeeper was semi-skilled work at the light level of exertion. He classified her prior building cleaner work as unskilled work at a heavy level of exertion.

The ALJ asked Dunleavy to consider a hypothetical individual closely approaching advanced age with limited education, the same past work experience as Stark, and the residual functional capacity to perform at the light exertional level with no climbing of ladders, ropes or scaffolds, no more than occasional climbing of ramps and stairs, no more than occasional balancing, stooping, kneeling, crouching, or crawling, and no overhead reaching. A.R. at 332. Dunleavy testified that such an individual could not perform Stark's past relevant work. Id. However, Dunleavy testified that such an individual could perform the following positions: packager,

cafeteria attendant, or small products assembler.  A.R. at 332-33.  On examination by Stark's attorney, Dunleavy testified that, if the hypothetical individual was limited to no more than occasional reaching with both arms in front, he or she would be unable to perform the jobs he previously identified.  Additionally, Dunleavy stated that a hypothetical individual who was limited to no more than occasional fine fingering and handling with both hands would not be able to perform any of the previously-identified jobs.  Dunleavy also testified that it would not be acceptable in the competitive work force for an individual to take three or more unscheduled days off in a month.

At the request of Stark's attorney, the ALJ agreed to leave the record open for thirty days after the hearing, to allow time to obtain results from an MRI of Stark's lower back scheduled later that week.  In a letter dated January 14, 2008, which was received by the SSA on January 16, 2008, Stark indicated that she wished to amend her alleged onset date to June 27, 2005.  A.R. at 185-86.  Stark provided the MRI test results via facsimile on January 25, 2008.  A.R. at 250-52.

III.   THE ALJ'S DECISION

On February 2, 2008, the ALJ issued a written decision, concluding

that Stark had "not been under a disability within the meaning of the Social Security Act from December 15, 2002 through the date of this decision." A.R. at 18. In reaching this conclusion, the ALJ followed the five-step analysis set out in 20 C.F.R. §§ 404.1520 & 416.920(a). The analysis requires a sequential evaluation of: (1) whether claimant is engaged in substantial gainful activity; (2) the severity and duration of claimant's impairment; (3) whether the impairment equals a listed impairment in Appendix 1; (4) whether the impairment prevents claimant from doing her past relevant work; and (5) whether claimant can perform other work, given her residual functional capacity, age, education, and work experience. The claimant has the burden of presenting evidence and proving the issues on the first four steps. The SSA has the burden on the last step; the SSA must show that, considering the listed factors, the claimant can perform some type of gainful employment that exists in the national economy. Young v. Barnhart, 362 F.3d 995, 1000 (7th Cir. 2004).

The ALJ determined that Stark met her burden on the first two steps of the analysis. The ALJ found that Stark had not engaged in substantial gainful activity since December 15, 2002, noting that, although Stark worked in the janitorial position after the alleged onset date, her earnings

were less than the amount necessary to establish substantial gainful activity. A.R. at 20. The ALJ held that Stark's degenerative disc disease caused significant limitation in Stark's ability to perform basic work activities. Id. The ALJ next concluded that Stark failed to demonstrate any impairment severe enough to equal an impairment listed on Appendix 1 (step three). The ALJ then considered whether Stark retained the residual functional capacity to perform her past relevant work (step four). The ALJ concluded that Stark retained the residual functional capacity to perform light work, except that she could not climb ladders, ropes or scaffolds, could not reach overhead, and could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. A.R. at 21. Based on this residual functional capacity, the ALJ determined that Stark had met her burden at step four in establishing that she was unable to perform her past relevant work, given the fact that her past relevant work had higher exertional requirements.

The ALJ proceeded to step five, i.e., the analysis of whether Stark could perform some type of gainful employment that exists in the national economy. Relying on vocation expert Dunleavy's testimony, the ALJ determined that Stark could make a successful adjustment to other work that exists in significant numbers in the national economy, including

representative occupations of packager, cafeteria worker, and assembler. A.R. at 25-26. Thus, the ALJ concluded that Stark was not disabled under the Social Security Act, and her request for SSI and DIB was denied.

IV. THE APPEALS COUNCIL

Stark appealed the ALJ's Decision to the SSA Appeals Council. A.R. at 14. The Appeals Council denied Stark's request for review, stating that it found "no reason under [its] rules to review the Administrative Law Judge's decision." A.R. at 7. Thus, the ALJ's Decision became the final Decision of the SAA. Stark then timely filed the Complaint (d/e 1) in the present case.

ANALYSIS

This Court will reverse the decision of the SSA if that decision is not supported by substantial evidence or results from an error of law. Lopez v. Barnhart, 336 F.3d 535, 539 (7th Cir. 2003). This Court reviews the ALJ's factual findings to determine whether they are supported by substantial evidence. Substantial evidence is, "such relevant evidence as a reasonable mind might accept as adequate" to support the decision. Richardson v. Perales, 402 U.S. 389, 401 (1971). This Court must accept the ALJ's findings if they are supported by substantial evidence and may not

substitute its judgment for that of the ALJ.  Delgado v. Bowen, 782 F.2d 79, 82 (7th Cir. 1986).  The issue before this Court is whether the ALJ's findings were supported by substantial evidence and not whether Stark is disabled. Jens v. Barnhart, 347 F.3d 209, 212 (7th Cir. 2003). The ALJ must at least minimally articulate his analysis of all relevant evidence.  Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994).  The Court must be able to "track" the analysis to determine whether the ALJ considered all the important evidence.  Diaz v. Chater, 55 F.3d 300, 308 (7th Cir. 1995).  This Court must not reweigh the evidence and should affirm as long as the ALJ "identifies supporting evidence in the record and builds a logical bridge from that evidence to the conclusion."  Giles ex rel. Giles v. Astrue, 483 F.3d 483, 486 (7th Cir. 2007).  If, however, "the ALJ's decision lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded."  Id. (internal quotations and citation omitted).

Stark seeks reversal or remand of the SAA's Decision, arguing the following: (1) the ALJ failed to give appropriate weight to Dr. Hegde's opinion, (2) the ALJ failed to take the amended onset date request into consideration, and (3) the ALJ's Decision is against the manifest weight of the evidence.  The Court addresses each of these arguments in turn.

# I. DR. HEGDE'S RESIDUAL FUNCTIONAL CAPACITY ASSESSMENT

Stark asserts that the ALJ erroneously discounted Dr. Hegde's opinions of May 31, 2006, that Stark meets Listing 1.02 and that she is capable of less than sedentary work. See A.R. at 210-12. Either of these opinions, if controlling, would dictate a finding of disability. The SSA's "treating physician" rule directs an ALJ to give controlling weight to the medical opinion of a treating physician regarding the nature and severity of an impairment if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence." Bauer v. Astrue, 532 F.3d 606, 608 (7th Cir. 2008) (internal quotations and citations omitted). However, "once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight" but is treated as "one more piece of evidence for the administrative law judge to weigh" consistent with factors identified in 20 C.F.R. § 404.1527(d)(2). See Bauer, 532 F.3d at 608. Additionally, it must be noted that a treating physician's administrative opinion – including opinions regarding an applicant's residual functional capacity or whether the applicant is disabled – is not entitled to

any particular weight because the determination that an individual is disabled is one that is expressly reserved to the SAA. 20 C.F.R. § 404.1527(e)(1).

On May 31, 2006, Dr. Hegde opined that Stark's impairment was the medical equivalent of Listing § 1.02 – Major dysfunction of a joint(s) (due to any cause). A.R. at 210-11. The ALJ determined that Stark's "degenerative disc disease does not meet or equal Listing 1.02B, major dysfunction of a joint, because it has not resulted in the inability to perform fine and gross movements effectively." A.R. at 21.[1] The ALJ expressly rejected Dr. Hegde's opinion on this issue as "conclusory with no supporting evidence" and contrary to the medical records. A.R. at 24-25. The ALJ's determination is supported by the record evidence; Dr. Hegde's is not.

Dr. Hegde fails to identify any medical evidence upon which his opinion is based, and the record is devoid of documentary support. Stark's medical records prior to May 31, 2006, do not document any inability to perform fine and gross movement effectively. In December 2004, Dr.

---

[1] The Court notes that Listing 1.02A is inapplicable to the instant case. Listing § 1.02B requires the involvement of one major peripheral joint in each upper extremity resulting in the inability to perform fine and gross movements effectively as defined in Listing § 1.00B2c. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 1.02.

Gelber specifically noted no focal weakness associated with the suspected radiculopathy. A.R. at 189. In May 2005, Dr. Chapa expressly determined after examination that Stark could "perform both fine and gross manipulations with both hands." A.R. at 194. Stark visited Dr. Hegde on four occasions prior to and including May 31, 2006. None of the examination notes for these visits indicate any problem with fine or gross manipulation other than Stark's complaint on May 31, 2006, that she was unable to lift a jug of milk. Additionally, the medical evidence subsequent to May 31, 2006, does not reveal limitations with gross or fine motor skills. The functional assessment completed at Dr. Hegde's request in July 2006, revealed that Stark could both grasp and carry a gallon jug. A.R. at 215-216. Dr. Hegde's May 31, 2006, opinion that Stark's impairment was the medical equivalent of Listing § 1.02 is unsupported and inconsistent with substantial record evidence. The ALJ did not err in failing to give this opinion controlling weight.

Dr. Hegde further opined on May 31, 2006, that Stark could perform sustained work at a less than sedentary level. A.R. at 212. The ALJ was not required to give this opinion controlling weight, because it related to an issue reserved for the SAA. See Collins v. Astrue, 324 Fed.Appx. 516, 520

(7th Cir. May 07, 2009) ("Had [doctor] opined, for example, that '[claimant] cannot perform sedentary work,' his opinion would not be entitled to any weight because it would be a conclusion on residual functional capacity – a determination reserved to the Commissioner."). Additionally, the ALJ correctly rejected this opinion as "conclusory with no supporting evidence" and contrary to the medical records. A.R. at 24-25. The ALJ noted that, on April 19, 2006, Dr. Hegde opined, in a conclusory letter, that Stark was unable to work. The ALJ recognized that Dr. Hegde did not offer an explanation, specifics, medical signs, or laboratory findings to support his assessment. A.R. at 24. As the ALJ correctly noted, Dr. Hegde's May 31, 2006, opinion regarding Stark's residual functional capacity suffers from the same defects. There are no medical findings in Dr. Hegde's notes or the medical records as a whole to support the limitation to less than sedentary work. The ALJ did not err in failing to give this opinion controlling weight.

II.     AMENDED ONSET DATE

By letter dated January 14, 2008, Stark indicated that she wished to amend her alleged onset date to June 27, 2005. As Stark correctly points out, the ALJ's February 2, 2008, opinion does not mention this amendment.

Additionally, the ALJ expressly concluded that Stark had not been under a disability within the meaning of the Social Security Act from December 15, 2002, Stark's original alleged onset date, through the date of the Decision. A.R. at 18. Contrary to Stark's argument, however, this error does not constitute grounds for remand.

First, the Court notes that the express finding that Stark had not been under a disability within the meaning of the Social Security Act from December 15, 2002, forward encompasses a finding that she was not disabled from June 27, 2005, forward. Stark's amended alleged onset date corresponds with the date she stopped working part-time as a building cleaner/janitor. The ALJ did not use the fact that Stark worked part-time after December 15, 2002, as a bar to her claim of disability. Rather, the ALJ considered this part-time work, along with other factors, in making a credibility determination regarding Stark's allegations of complete and total disability. A.R. at 24. Stark's attempt to amend her alleged onset date far into the administrative process does not eradicate Stark's consistent representations to the SAA over the course of several years that she was unable to work beginning December 15, 2002. Additionally, while Stark asserts that her amended onset date corresponds to the worsening of her

condition, the medical evidence does not support a finding that Stark's condition worsened in June 2005, or at any time thereafter.  <u>See</u> <u>Brief in Support of Plaintiff (d/e 10)</u>, p. 3.  In fact, the contemporaneous medical evidence is to the contrary.  Dr. Chapa made his examination and report in mid-May 2005.  Dr. Pineda examined Stark in July 2005 and declined to provide her with paperwork to support her disability claim.  As set forth below, the evidence supports a finding that Stark had not been under a disability within the meaning of the Social Security Act from June 27, 2005, forward.

III.   <u>MANIFEST WEIGHT OF THE EVIDENCE</u>

Finally, Stark asserts that the ALJ's Decision was against the manifest weight of the evidence.  This Court must not reweigh the evidence.  Rather, the Court must determine whether the ALJ identified supporting evidence in the record and built a logical bridge from that evidence to his conclusion. <u>See</u> <u>Giles</u>, 483 F.3d at 486.  The Court finds that the ALJ's Decision satisfies this standard.

Stark argues that the ALJ failed to assess her functional abilities in determining that she retained the residual functional capacity to perform light work.  Specifically, Stark contends that the ALJ made no mention of

her ability to sit, stand, walk, lift, reach, push and pull, or to finger and manipulate or grasp objects. Stark further contends that the ALJ failed to address any functional problems with her arms and her decreased grip strength. These arguments are unpersuasive.

The regulations define "light work" as work requiring lifting no more than twenty pounds at a time with frequent lifting or carrying of up to ten pounds and a good deal of walking/standing, or sitting with some pushing and pulling of arm or leg controls. 20 C.F.R. § 404.1567(b). The ALJ determined that Stark could perform light work but could not climb ladders, ropes or scaffolds, could not reach overhead, and could only occasionally climb ramps and stairs, balance, stoop, kneel, crouch, or crawl. A.R. at 21. This assessment is not contrary to the medical evidence and is supported by the July 2006 functional assessment. As the ALJ recognized, the July 2006 functional assessment revealed lower than normal bilateral grip strength. A.R. at 24, 215. In considering this evidence, the ALJ correctly noted that the physical therapist reported that it took a significant amount of cueing to get Stark to produce any type of effort during upper extremity testing. A.R. at 24, 215. The ALJ's residual functional capacity assessment is supported by substantial record evidence.

Stark further asserts that the ALJ's Decision is internally inconsistent. Specifically, Stark argues that the ALJ's determination at step two that Stark's degenerative disc disease caused significant limitation in Stark's ability to perform basic work activities is inconsistent with his conclusion at step five that she could perform some type of gainful employment. There is no inconsistency to be resolved, and Stark's claim of error fails. At step two, the ALJ must consider the severity and duration of the claimant's impairment. If the claimant is unable to perform past relevant work, at step five, the ALJ must determine whether the claimant can perform other work, given her residual functional capacity, age, education, and work experience. In the instant case, the ALJ determined that Stark's degenerative disc disease caused significant limitation in Stark's ability to perform basic work activities. This finding is supported by the record evidence. The ALJ went on to assess Stark's residual functional capacity, taking the limitations into account. The ALJ's residual functional capacity assessment is supported by the record evidence. At step five, the ALJ determined that Stark could perform other work, given her residual functional capacity, age, education, and work experience. This finding is supported by the record evidence.

Finally, Stark argues that the ALJ's determination is inconsistent with

the limited daily activities to which she testified. In making his determination, the ALJ found that Stark's statements concerning the intensity, persistence, and limiting effects of her symptoms were not entirely credible. A.R. at 23. An ALJ is in the best position to determine the credibility of witnesses; therefore, this Court must afford the ALJ's credibility determinations considerable deference, overturning them only if they are "patently wrong." Craft v. Astrue, 539 F.3d 668, 678 (7th Cir. 2008). In the instant case, the ALJ properly presented specific reasons for his adverse credibility determination. See id.; A.R. at 23-24. There is nothing in the record to indicate that the ALJ's failure to fully credit Stark's testimony was patently wrong. Stark's claim of error fails.

## CONCLUSION

THEREFORE, for the reasons set forth above, Plaintiff's Motion for Summary Judgment (d/e 11) is DENIED, and Defendant's Motion for Summary Affirmance (d/e 13) is ALLOWED. The Decision of the Commissioner of Social Security is AFFIRMED. All pending motions are denied as moot. This case is closed.

IT IS THEREFORE SO ORDERED.

ENTER:   March 18, 2010

FOR THE COURT:

                    s/  Jeanne E. Scott
                 JEANNE E. SCOTT
          UNITED STATES DISTRICT JUDGE